SCHOEN, Appellant, vs. SCHOEN, Respondent.

*April 9—September 23, 1921.*

*Divorce: Grounds: Cruel and inhuman treatment: How accomplished: Wife employing means other than personal violence: Loss of temper by husband: Effect on husband's action: Evidence: Sufficiency: Division of property: Amount awarded wife.*

1. In an action by the wife for a divorce, the evidence is *held* to show that she had been guilty of a course of cruel and inhuman treatment of the husband practiced by means other than personal violence, through manifesting hatred toward him, through interference in his business, through placing her financial differences with her husband in the hands of an attorney, by employing various methods of coercion, if not blackmail, in attempting to secure a financial settlement, and by persistently worrying and harassing the husband.
2. The evidence is also *held* insufficient to show that the husband had been guilty of such cruel and inhuman treatment as to entitle the wife to a divorce or such as to forfeit his own right

to a divorce from her, although it appears that at times, because of the attitude of the wife, he lost control of his temper and behaved in a manner inconsistent with the relations of husband and wife, as on the whole he appears to have exercised self-restraint and to have been willing to do all that reasonably might have been expected of him to restore peaceful relations.

3. Where the husband had secured an absolute decree because of cruel and inhuman treatment, the evidence is *held* to justify the application by the trial court of the rule that under ordinary circumstances one third of the property of the parties will be awarded to the wife.

APPEAL from a judgment of the circuit court for Milwaukee county: GUSTAVE G. GEHRZ, Circuit Judge. *Affirmed.*

Action for divorce. Plaintiff and defendant were married in the state of New York on November 2, 1884. At the time of trial plaintiff was sixty-two years of age and the defendant fifty-nine years of age. Two children, Hortense, aged twenty-nine, and Edgar, aged twenty-six, were the living issue of said marriage.

The defendant is a man of considerable business energy and has had a varied business career. Prior to 1898 he had been in various businesses in different parts of the country. During that year he removed from San Francisco to Chicago in straitened circumstances. He obtained a position with Siegel & Bros. at $25 a week.

*Mrs. Schoen* had considerable talent as a designer of styles, and at *Schoen's* instigation she designed and manufactured some petticoats for Siegel & Bros. The latter were satisfied with her work and *Schoen* later rented a factory in Chicago and turned out a considerable volume of petticoats for Siegel Bros. During this time he continued his position with Siegel Bros., and *Mrs. Schoen* devoted practically all of her time to the factory. Sometime thereafter, at the instance of Siegel Bros., *Schoen* rented a factory for the manufacture of petticoats at Racine. Siegel Bros. purchased the equipment for the Racine factory, but by some mistake on the part of the credit man, instead of buying the

equipment in the name of Siegel Bros. it was bought in the name of *Schoen,* and *Schoen* was charged with the amount thereof on the books of Siegel Bros. This factory did a considerable business and transformed a large volume of goods for Siegel Bros. With a change of management of the department of Siegel Bros. with which *Schoen* was doing business came a disposition to cut down the volume of orders for business given to *Schoen's* factory. This was on the theory that Siegel Bros. owned the factory or the equipment. The circumstance gave rise to the question whether Siegel Bros. or *Schoen* owned the equipment, at which time the mistake on the part of the credit man was discovered, and it seemed to be conceded that *Schoen* had legal title to the equipment, and Siegel Bros. were influenced to continue giving orders to *Schoen* to enable him to pay off his indebtedness to the company. However, the balance then due was converted into notes signed by *Mrs. Schoen.* This seems to have been for the reason that *Schoen* was involved financially and did not want the title to this equipment. Later, in bankruptcy proceedings, he swore that *Mrs. Schoen* owned the business and equipment. While the business was at first carried on in the name of the Schoen Manufacturing Company, it was at about the time of the giving of these notes changed to *Rosa Schoen,* doing business as the Schoen Manufacturing Company.

*Mrs. Schoen* worked very hard in this factory, giving much of her personal attention to the management thereof and to the designing of styles, while *Schoen* continued in a higher salaried position with Siegel Bros., although he at all times exercised a sort of advisory supervision over the business. He lived in Chicago during this time, but went to Racine on the one o'clock train on Saturday, returning on the six o'clock train Sunday evening. During this time he was very busy about the business and always figured up the payrolls.

Schoen v. Schoen, 175 Wis. 20.

This business was continued in Racine until 1902 or 1903, when the defendant's health became impaired and he was obliged to go West because of such ill-health.  He took with him the accumulations of the Racine business, somewhere around $15,000, and went into the mercantile business in Denver.  *Mrs. Schoen* lived in Chicago and *Mr. Schoen* sent her $200 every month for living expenses.  In a short time he became bankrupt.  At the bankruptcy sale of his stock he purchased a portion thereof with money secured from a lawyer in Denver, took it to San Francisco, where he turned it over at a profit of $2,800.  He then returned to Chicago with the $2,800, which was all the money they had.  This was in 1906.  He then organized the Paris Fashion Company in Milwaukee in association with one Max Friedlander.  The capital stock of this company was $5,000.  Friedlander put in $2,500 and *Schoen* put in $2,500.  The capital stock consisted of 100 shares of $50 each.  *Schoen* had forty-nine of the fifty shares, to which he was entitled by reason of his investment, placed in the name of his wife.  This, it is claimed, was done because Moeller, the Denver lawyer who had advanced him the money to buy a portion of his bankrupt stock, claimed that *Schoen* had not paid him, and to embarrass Moeller in pressing his claim against *Schoen* he had the capital stock of the Paris Fashion Company issued in the name of his wife.

The business seemed to prosper, and about a year later *Schoen* bought out Friedlander, taking the shares thus purchased in his own name.  He purchased a rather pretentious home, paying $1,500 down thereon, which was taken from the Paris Fashion Company.  The title to this property was taken in the name of *Mrs. Schoen.*

In 1910 *Mrs. Schoen* spent the summer in California for her health.  In the same year she, with her son Edgar, departed for Europe for a prolonged sojourn.  As she was sailing from New York an incident occurred which has an

important bearing on subsequent events. Her daughter Hortense was married against the will and over the protest of *Mrs. Schoen* in 1910, although with the full knowledge and consent of *Mr. Schoen*. *Mrs. Schoen* became very bitter towards the daughter and had completely ostracized her. At the time she sailed for Europe the daughter was living in New York. *Mr. Schoen* accompanied *Mrs. Schoen* to New York and was instrumental in bringing about a meeting between *Mrs. Schoen* and the daughter in the hope that a reconciliation might result. The meeting was a rather pleasant one, and the daughter promised to be at the pier the next morning as *Mrs. Schoen* should take the boat, but for some reason she was unable to keep the appointment and *Mrs. Schoen* sailed without again seeing the daughter. It seems that this incident further embittered *Mrs. Schoen* towards the daughter.

A few months after *Mrs. Schoen* had reached Europe, and during the Jewish holidays, *Mr. Schoen* invited the daughter and her husband to his home in Milwaukee to spend the holidays. *Mrs. Schoen* heard of this and was still further embittered. From thence on she assumed towards *Mr. Schoen* an attitude of bitterness that was little short of hatred, as manifested by her written communications. When she heard that her daughter had spent the holidays with *Mr. Schoen* she wrote him a letter in which she stated:

"Now, *George,* I wish you and your daughter for whom you have sacrificed everything, a long life—all of you should get to be 100 years old and that I will beg God for it and hope you will get the good treatment that you will be looked after and you can live any way you want. How you will tell the Milwaukee people I am never coming back to America, that is up to you. I do not write to anybody. I wrote you all that I intend to do with Edgar and when he is through I will send him back to America. Every letter from now on that you will send I will without opening return to you as we two are through with each other and thank God a finish with terrors is better than terrors without a finish

and this is what I had for twenty-seven years and the last eight months were the same."

On October 5, 1912, she wrote him a letter acknowledging receipt of his cabled New Year's greetings, wondering why he sent them, and assuring him that he need not cable, saying:

"I think you and your daughter can go quietly to sleep, both of you with your good hearts now that you are again pured we will commence to make a finish of the whole affair. I wrote to lawyer Glicksman, but he wanted to know too much and I didn't care to tell him, and so I wrote to lawyer Cowen that on account of your sickness could he go deeply into the matter, but now that you are well, I will make a finish, as I will now make a home here for myself, because I like it here better and I will fix up a home. . . . I dictated a biography of my life and only the main things— the smaller affairs the reader will be able to think. This book I will send to your son-in-law, then he has the right to know everything, so I dictated it as if I would dictate it for him, especially as Mr. Levy, your brother-in-law, is again in your good graces. I did not send this book yet to the address, especially as long as your son-in-law in regard to what I asked, so I thought I rather send it to another address. I must send this book to a lawyer as when the man must have my case, he must be able to look behind the scenes. Now, I ask you, do you want anyone to read this book. Perhaps if you would read the book you would settle with me without trouble, and we would only need a lawyer to make this legal, because I am going to seek my rights—where and how I can without consideration, as you now said what one does, one must do altogether. Now one thing more in regard to your daughter. I do not know that person and I think you must have lost your senses, when you write to me about him or her, because they did everything so that I do not want to know about them, like it says 'An eye for an eye,' and I will not forget it in the hour of my death, that she made Jeanette her dear aunt."

In numerous ways she sought to interfere with the management of his business and did many things calculated to

embarrass and harass him in his business.  She first demanded the discharge of Miss Bowers, the bookkeeper of the Paris Fashion Company, an old and faithful employee, and in the letter demanding the discharge she used this language:

"This letter will reach you in the middle of the week, and on the end of the week the end will come and *you* will go under by it.  And even if I have to make my living as a nurse girl for children, I will be perfectly satisfied, because no one knows that I often ate my bread and butter, for which I had to pay with shame; so either Miss Bowers goes, or you and I go under as true as God shall help me.  So I want the answer by cable whether the person is gone or not.  And when she is gone, I want everything detailed as far as business is concerned; and if she doesn't go, the business will."

Her demand not having been acceded to, she later wrote as follows:

"If I say so she must go, well then I want to see whether she will or not.  I discharged her by cable and at the same time I wrote my lawyer that he sees whether or not this person is still there.  I will write a letter to my lawyer to demand the discharge of this person and put it in such a light that it should look like it is a female employee, so it should look like a scandal and demand her discharge immediately."

There was in the employ of the Paris Fashion Company a man by the name of Kleeman.  He was employed at *Mrs. Schoen's* own suggestion, and when *Mrs. Schoen* left for Europe Mr. and Mrs. Kleeman took up their abode in the *Schoen* home, with *Mrs. Schoen's* knowledge and consent.  Suddenly *Mrs. Schoen* demanded that they leave the house at once, making her demand by cable, and after they had left the house, because Mrs. Kleeman did not write to her, she wrote Mrs. Kleeman a most insulting letter and spoke most contemptuously concerning the ability and worth of Mr. Kleeman.

In February, 1913, she inclosed in an envelope, addressed to *Mr. Schoen,* an unsigned power of attorney, constituting William D. Thompson, Esq., of Racine, Wisconsin, her attorney to adjust her affairs with *Mr. Schoen* and the Paris Fashion Company, and a letter saying:

"Shall I sign this original: Or will you be more satisfied to come to terms with me without this. Last year you had your mouth pretty full that you can always make a living for yourself, but this is all tomfoolery, only talk. You may get a place and work for $15 a week, but places for $4,000 a year do not lay on the street, especially when a man is your age and especially not when a man had a stroke of apoplexy, even though the stroke was very light. Your good friends should have sent you away for three months to Florida, but they are only good to amuse themselves with you for a few hours, but when it comes to spending money, then that is different. They may invite you for a meal for business reasons, but when the finish is there and you have lost all, then everything evaporates like the wind. But I got enough out of the furniture so that I can start up again and I can make a living for myself at any time. You must answer this by cable."

Later on she employed Mr. Thompson to procure a settlement of her financial matters with *Mr. Schoen* and the Paris Fashion Company. Protracted negotiations were had between Mr. Thompson and *Mr. Schoen,* but nothing resulted. At the trial Mr. Thompson testified that "during all of these negotiations as far as property matters were concerned, *Mr. Schoen* told me that he would be willing to concede almost anything, just to get peace of mind; in just practically those words, he would give her the whole business to have peace."

When *Mrs. Schoen* left for Europe she had a letter of credit for $1,000 and *Mr. Schoen* sent her regularly weekly remittances of $75. A few months before returning in 1913 she drew on him through his bank for $1,000. At that time *Mr. Schoen* had borrowed heavily from the bank and was in rather close financial circumstances. The draft

came without any warning and constituted an unexpected burden—a sudden emergency which caused *Mr. Schoen* great financial embarrassment. She returned from Europe in August, 1913. Upon her return to New York she called upon his principal creditors in that city, deplored his business capacity, declared that failure of his business was imminent, and warned against their extending him further credit. *Mr. Schoen* had gone to New York to meet her, but reflecting upon all that had occurred he feared that he might not be able to contain himself and that a scene might result if he met her at the boat. Accordingly he did not meet her, but his creditors informed him of her visit and the nature thereof. Naturally this affected him greatly. She came on to Milwaukee and went to their home. He returned to Milwaukee and took up his abode at a hotel, where he remained for a number of days. Finally mutual friends persuaded him to return to the home. This was sometime in August. From that time until the 6th day of September, 1913, she was demanding a settlement of financial matters between them. According to his testimony she gave him no rest day or night, until on September 6, 1913, a contract was entered into between them which provided that *George B. Schoen* should conduct the business of the Paris Fashion Company as economically as possible; that an annual inventory should be taken in the presence of *Rosa Schoen;* that a copy of the trial balance of the books of account should be given to *Rosa Schoen* each month; that no donation or charitable contributions should be made out of the funds of, or charged to, the company in excess of $100; that neither party will engage in any outside venture or speculation; that *George B. Schoen* should not expend more than $800 per year in trips to New York; that each party should draw from the company's funds $5,750 by way of services to the company. Out of the amount so drawn by each party each shall pay and contribute one half of the

expenses of their son Edgar's maintenance and education, the total of which shall not exceed $1,200 per year, one half of the premium on Edgar's life insurance policy, and one half of the interest charged on the mortgage standing against the real property owned by *Mrs. Rosa Schoen* known as No. 1706 State street, Milwaukee. *George B. Schoen* agreed to assign to *Rosa Schoen* life insurance policies aggregating $33,000. Such are the principal parts of the contract, although it is replete with details not necessary to be set forth here.

Matters then ran along, and in April, 1914, the home was sold and the proceeds thereof given to *Rosa Schoen,* who reinvested the same in other properties in Milwaukee. About this time the bank demanded a settlement of the Paris Fashion Company's indebtedness, and *Rosa Schoen* executed to the bank, as security for such indebtedness, mortgages on her property. After the sale of the home *Mr.* and *Mrs. Schoen* lived at the Hotel Martin. Things were not entirely agreeable between them during this time, but it is not deemed important to enter into detail concerning such matters.

On June 27, 1914, *Mrs. Schoen* went to Resthaven, in Waukesha. *Mr. Schoen* visited her there July 4th and left for New York July 5th. While he was in New York *Mrs. Schoen* called at the Paris Fashion Company store and countermanded an order and directed the return of some goods which had been received by the Paris Fashion Company from New York pursuant to an order given therefor by *Mr. Schoen,* and sent the following telegram to *Mr. Schoen,* who was then in New York: "Ordered goods returned so do not countermand my order if you do not want explanation to bank about management. Letter follows;" and three days later she sent a lettergram as follows:

"Before you go to store come to Waukesha. You left Thursday, Friday Mrs. Grossbaum came to Nugent. Terri-

ble fight with Fritzie before customers. Grossbaum had to take wife from store. Never returned that afternoon. The honest man also took charge of cash drawer. Says has you pat as ace."

Upon his return from New York *Mr. Schoen* called on her at Resthaven hotel and a very stormy interview resulted. In April, 1914, *Mrs. Schoen* bought tickets for Europe to sail August 3d for New York. During the latter part of July *Mrs. Schoen* started for New York preparatory for sailing. She stopped at Winnetka, Illinois, to visit her daughter, with whom she was then reconciled. While there she was informed that no boats would sail because of the breaking out of the war. She called *Mr. Schoen* on the telephone. The character of this telephone communication is in dispute, but either *Mr. Schoen* told her it was none of his business what she did, or she told him it was none of his business what she did. Any way *Mrs. Schoen* returned to Wisconsin, spent a number of weeks at the Dells, some further time in Madison, and went to the Moore baths in Waukesha. While at the Moore baths she purchased a lot in Waukesha and built a cottage thereon. *Mr. Schoen* knew nothing of her whereabouts until sometime in December, when she called him on the telephone and asked permission to take some furniture from the storage warehouse for the use of her cottage. Her cottage was ready for occupancy by Christmas. Thereafter this cause of action was commenced.

The first three causes of action set forth in the complaint involve property rights and transactions between the parties, the nature of which it is unnecessary to set forth. The fourth cause of action is for a divorce from bed and board. Defendant answered the several causes of action set forth in the complaint and counterclaimed for an absolute divorce.

The case was tried before the court, and findings were

made and filed in which it was set forth that all the property or property rights owned by the plaintiff and sought to be enforced in her several causes of action were derived, directly or indirectly, from the defendant, and that she had neither property nor property rights constituting her separate estate. The court denied a divorce upon plaintiff's cause of action, but granted to the defendant an absolute divorce, and allowed to the plaintiff as a. final distribution an amount equal to about one third of the property owned by both plaintiff and defendant. From that judgment plaintiff brings this appeal.

For the appellant there was a brief by *Lines, Spooner & Quarles,* and oral argument by *Willet M. Spooner* and *Howard A. Hartman,* all of Milwaukee.

*Christian Doerfler* and *Charles Friend,* both of Milwaukee, for the respondent.

The following opinion was filed July 13, 1921:

OWEN, J. The questions raised upon this appeal are almost entirely questions of fact. The record is voluminous, the printed case containing approximately 1,500 pages. Anything like a complete review of the evidence would prolong this opinion to an inordinate length. In fact the judgment well might be affirmed without an opinion. The contest, however, has been a stubborn one from the beginning. The plaintiff has experienced great difficulty in having the case prepared for presentation to this court, the time for the preparation and service of the printed case having been substantially extended. She has incurred great expense, and to affirm the judgment without an opinion might be regarded as too summary a disposition of a case which consumed the time of the trial court for upwards of seven weeks, and which has been presented to this court with great diligence and labor on the part of the attorneys.

The first question to consider is whether the court correctly determined the divorce issue. The material finding upon this issue is as follows:

"That for several years prior to the 1st day of August, 1914, and since about the year 1911, the plaintiff became, and was, guilty of a course of cruel and inhuman treatment of and towards the defendant *Schoen,* practiced by her by means other than personal violence; that she manifested a feeling of intense and groundless hatred and contempt and a vindictive, unforgiving, and unrelenting disposition towards him; that her conduct was such as to evince a persistent wantonness and a determination and design to deliberately and constantly worry and harass him and to keep him in a state of fear and anxiety over his business affairs, which, during a considerable part of said period, were in precarious financial condition, and to keep him in a state of apprehension lest she would undermine and destroy his character and social standing; that in pursuance of such determination and design she continually threatened him with exposures that would effect his financial embarrassment and ruin, and unjustifiably accused him of gross neglect and dishonesty in his business affairs; that she frequently interfered in his conduct of his business by discharging employees contrary to his wishes and without his consent, by interfering with his purchases and sales of goods and by derisively criticising his business ability and methods; that such interference in his business was carried on in a manner that had a tendency to destroy the discipline of his employees and to degrade and humiliate him before them."

We think this finding is abundantly sustained by the documentary and undisputed evidence in the case. No marital difficulties had arisen between the parties to this action prior to *Mrs. Schoen's* departure for Europe. Up to that time the marital relations were entirely pleasant. *Mr. Schoen* accompanied her to the pier in New York, saw her safely aboard the vessel, provided her with a letter of credit for $1,000, and regularly remitted $75 per week. The only family disturbance that had occurred prior to that time arose because of the marriage of the daughter Hortense

without the knowledge or consent of the mother. An estrangement existed by reason thereof between the mother and daughter, and *Mr. Schoen* most earnestly desired a reconciliation. He performed his best offices to bring about such reconciliation before *Mrs. Schoen* departed for Europe, but such successes as he was able to obtain in that respect were entirely neutralized by the failure of the daughter to meet *Mrs. Schoen* at the pier on the morning of her departure. By reason of this failure the feelings of the mother were intensified, if such were possible, and she set foot on European soil entertaining the bitterest animosity towards her offspring. *Mr. Schoen* did not share in this animosity. In fact it is certain that because of its existence on the part of *Mrs. Schoen* he was much depressed in spirits, and the incident caused him great grief. In response to most natural paternal instincts, he invited the daughter and her husband to spend the holidays with him in Milwaukee. This was evidently construed by *Mrs. Schoen* as a mortal affront, and she became imbued with the same vindictive animosity towards her husband that she then cherished towards her daughter. She immediately assumed an attitude of hostility and ill-concealed hatred towards her husband, which was manifested in many ways.

First of all, it stands undisputed that she placed her financial affairs with her husband in the hands of an attorney. This in itself is a serious shock to one's ideals of proper marital relations, and we suggest that whether the employment of an attorney by one spouse to prosecute by legal means the enforcement of property rights against another does not evince an entire lack of that sympathy and love which should characterize the marital relations as a most appropriate subject for reflection. Without meaning to declare that it in itself constitutes cruel and inhuman treatment, such an incident certainly is quite inconsistent with marital duties and obligations. The marital relation carries with it a unity of interest and sympathy, the pleasure

and duty of mutual helpfulness, the sharing of burdens and
sorrows, mutual sentiments and feelings entirely inconsistent
with the waging of legal controversies between husband and
wife. The institution of legal proceedings by one spouse
against another for the enforcement of mere property rights
or financial interests, if not provoked by unjust conduct
on the part of the other, dangerously approximates the
character of a cruel and inhuman act, not because of the
purpose to enforce property rights, but because the enforce-
ment thereof in such a manner indicates a lack of marital
sympathy and love and constitutes a rude shock to the marital
sensibilities and relations. Hostile legal proceedings be-
tween ordinary business partners usually result in a termina-
tion of the partnership. If such be the result concerning a
mere business relation, it well may be questioned whether
the much more personal and sacred relation of husband and
wife can survive under such circumstances.

But assuming that such action may be taken on the part
of one spouse towards the other in good faith and for
justifiable purposes without disturbance of the marital rela-
tions or injury to conjugal sensibilities, such is not the case
here. *Mrs. Schoen's* entire conduct towards the defendant
while in Europe was one of open hatred and avowed con-
tempt. She refused to open his letters. She told him that he
need not send her birthday greetings. She interfered with
the management of his business by demanding the discharge
of a valued and trusted employee. She did this by letter
and by cablegram. She threatened to write her autobiog-
raphy which would bring shame and disgrace upon him.
She demanded the expulsion of the Kleemans, whom she had
invited to her home, from her house, to the great humiliation
of her husband. She practiced various methods of coercion,
if not blackmail.

"I will write a letter to my lawyer to demand the discharge
of this person [Miss Bowers] and put it in such a light that

it should look like it is a female employee, so it should look like a scandal and demand her discharge immediately. I want that when this letter reaches you that Miss Bowers be discharged, otherwise I will get redress by writing to the bank." "Shall I sign this original [power of attorney] or will you be more satisfied to come to terms with me without this." "How you will tell the Milwaukee people I am never coming back to America, that is up to you." "Every letter from now on that you will send I will without opening return to you as we two are through with each other and thank God a finish with terrors is better than terrors without a finish." "Now one thing more in regard to your daughter. I do not know that person and I think you must have lost your senses, when you write to me about him or her, because they did everything so that I do not want to know about them, like it says 'An eye for an eye,' and I will not forget it in the hour of my death, that she made Jeanette her dear aunt." "I dictated a biography of my life and only the main things—the smaller affairs the reader will be able to think. This book I will send to your son-in-law, then he has the right to know everything, so I dictated it as if I would dictate it for him, especially as Mr. Levy, your brother-in-law, is again in your good graces. I must send this book to a lawyer as when the man must have my case, he must be able to look behind the scenes. Now, I ask you, do you want any one to read this book. Perhaps, if you should read the book you would settle with me without trouble and we would only need a lawyer to make this legal, because I am going to seek my rights—where and how I can without consideration."

Without warning she drew a draft upon him for $1,000 at a time when it caused him most serious embarrassment, and she drew it through the bank at which he was a large borrower. Her first act upon arrival on American soil was an attempt to ruin him with his principal creditor. Upon arrival at home she pestered him by day and by night until he purchased peace by signing the contract mentioned in the statement of facts. This contract itself goes very far towards an intentional severance on her part of their marriage relations.

Early in the following spring, after their home had been disposed of and she had appropriated the proceeds, she made her plans and purchased tickets for her return to Europe in August. The execution of those plans was frustrated by the outbreak of war, after which she pursued her own way without conference or communication with *Mr. Schoen* until the month of December, during which time she purchased a lot, built a cottage, and had it ready for occupancy in the city of Waukesha. She sent him a New Year's greeting consisting of a blank piece of paper. She addressed him a most contemptuous letter on the occasion of his birthday, in which she saluted him as the shrewdest and smartest merchandise man in the land. This letter was written July 17, 1914, just prior to her intended departure for Europe. March 11, 1915, she wrote a letter to Bonis & Company, New York, a large creditor of *Mr. Schoen,* deploring his business incapacity and warning it against further extension of credit. She approached John E. DeWolf, a financial backer of *Mr. Schoen* in Milwaukee, and expressed surprise that he should loan *Mr. Schoen* any money or extend him any credit.

A more consistent and persistent course of cruel and inhuman treatment can scarcely be imagined. It indicates a transition from marital love and sympathy to hatred and contempt. Every conjugal instinct is dead, and in the breast where love, sympathy, and a spirit of helpfulness once bloomed in beauty, hatred, contempt, and a disposition to destroy now thrive in ugliness.

It will be noted that in arriving at this conclusion we have confined ourselves to the record made by *Mrs. Schoen.* As may be inferred from the statement that the printed case contains 1,500 pages, there is much of charge and counter-charge. There is much disputed testimony. Certain anonymous letters reflecting seriously upon *Mr. Schoen's* credit, addressed to his creditors, were received in evidence which

appellant strenuously contends should not have been received because of the failure of proof that they were written by *Mrs. Schoen.* No mention is made or consideration given to those letters. Neither is mention made nor consideration given to the disputed testimony in the case. The written record made by *Mrs. Schoen* is in our judgment abundantly sufficient to justify the finding of the court upon the issue of divorce.

It is urged by the appellant that the defendant was guilty of such cruel and inhuman treatment as to entitle the plaintiff to a divorce, and that at least his conduct was such as to forfeit his right to a divorce. The acts of misconduct on the part of defendant relied upon by plaintiff to constitute violations of his marital obligations are those occurring after the return of *Mrs. Schoen* from Europe. Reference has already been made to the fact that prior to *Mrs. Schoen's* departure for Europe the relations between plaintiff and defendant had been pleasant. It is true that *Mr. Schoen* had counseled and consented to the secret marriage of the daughter, knowing that this was in opposition to the desires of *Mrs. Schoen.* However, this incident created no rupture between *Mr.* and *Mrs. Schoen,* and there is no suggestion that the difficulties arising between them are attributable to that incident, even though it could be said that the consent of a father to the marriage of a child, opposed by the mother, affords the mother grounds for divorce.

It is first said that when negotiations were being pressed by Mr. Thompson, acting as attorney for *Mrs. Schoen,* certain propositions made by *Mr. Schoen* looking towards a settlement were conditioned on an absolute divorce, as indicating an intention and purpose on his part to bring about a severance of the marriage relation. It is true that during these negotiations the question of whether any arrangement entered into between the parties looking towards a settlement of their financial affairs would be permanent was discussed,

and Mr. Thompson told *Mr. Schoen* that it would not necessarily be permanent unless a divorce should be secured. Mr. Thompson admits that he told *Mr. Schoen* this, although there is disagreement between *Mr. Schoen* and Mr. Thompson as to who first suggested the necessity of getting the divorce in order to assure a final and definite settlement between them.   However, to our minds this has little significance, because the conduct of *Mrs. Schoen* up to that time gave to the defendant a complete cause of action for divorce. In view of what had transpired it is little wonder that he had in mind the matter of procuring a divorce, and especially when advised by the attorney for the plaintiff that no arrangement entered into could be regarded as final and permanent as long as the marital relation continued.

Certain acts of unkindness on the part of defendant towards plaintiff occurring after her return from Europe are stressed in the brief of appellant as constituting cruel and inhuman treatment, and it is further stated that after the sale of the home on State street in April, 1914, defendant made no effort to procure another home.   Although it appears in the record that defendant did have under consideration the purchase of a property on Grand avenue with a view of converting it into a homestead, and that *Mrs. Schoen* had expressed her satisfaction therewith, yet under all the circumstances the defendant was under no obligation to provide a further home.   Even at that time *Mrs. Schoen* had purchased passage for Europe, intending to sail August 3d.   She had manifested no particular interest in the purchase of another home and had not urged the matter upon the defendant.   When she was prevented from following out her plans to sail, as intended, she had no further communication with the defendant, but proceeded to the erection of a cottage of her own in the city of Waukesha.   The stormy interview at Resthaven hotel, upon defendant's return from New York, is dwelt upon as constituting an act of cruel and inhuman treatment.   There is little doubt that defendant

demeaned himself in a violent manner upon that occasion, but the provocation therefor must not be overlooked. Plaintiff had most officiously intruded herself into the business affairs of the defendant, had countermanded his order for merchandise in New York, and had ordered goods returned that had been shipped pursuant to his direction. A threatening telegram had been sent to him in New York not to interfere with the countermand. He had been peremptorily ordered to visit Resthaven or the bank would be told about the management of the business. This was but a continuation of a systematic and meddlesome interference with his business affairs for a period of two years, and while his violent behavior at the time is not to be condoned, nevertheless it is not greatly to be wondered at. However, that did not affect the prior conduct of the plaintiff which abundantly constituted grounds for divorce on the part of the defendant.

From the commencement of hostilities on the part of *Mrs. Schoen, Mr. Schoen* evidenced a magnanimous and generous disposition. On August 15, 1912, he wrote her a letter, which was returned to him unopened, in pursuance of her declared policy not to receive or read any of his letters. In the letter he speaks of the unjust accusations made by *Mrs. Schoen,* states that he is working day and night to make a success of the business, and declares:

"Certainly if you carried out your idea to write to the lawyers, which I cannot stop you, why then it is possible that the success will disappear because no business can stand an open scandal whether justified or unjustified. But in this case no one will blame me and it is all the same whether you are right with your private opinion what comes, or whether you are wrong, but this should be no cause to ruin the business. But why go to a lawyer? I will give you advice. Come with Edgar back and when you come and land here you can go with him to Boston, live near Harvard, and you can travel from there to here and we can arrange three different ways of settling this matter: 1. I resign and give

everything to you. I will leave and always can work up in another place. All I want for myself in this case is $1,000 and you can have all the rest. 2. Everything remains as it is and you can draw $5,000 a year. 3. We can sell out the good will and leases and I believe I can get a pretty good sum out of the business and I am perfectly satisfied to give you two thirds and keep one third for myself in case everything is done in an honorable manner, but this cannot be done over night."

And Mr. Thompson, her attorney, testified that during his negotiations with *Mr. Schoen* he told him that he would be willing to "concede almost anything to get peace of mind; he would give her the whole business to have peace."

In the face of the vitriolic attitude of *Mrs. Schoen* during this period it is not surprising if at times the defendant lost control of his temper and behaved in a manner inconsistent with the relations existing between husband and wife. But on the whole it appears that he exercised great self-restraint and that he was willing to do all that might reasonably be expected of him to restore peaceful relations. A holding that his conduct constituted grounds of divorce on the part of plaintiff or operated to foreclose his right thereto would be unsupported by any consideration of justice.

The only remaining matter to be considered is the property rights of the parties. The court considered that the property owned by *Mrs. Schoen* was acquired from her husband and as such subject to distribution under the provisions of sec. 2364, Stats., which authorizes the court, upon decreeing the divorce, to "finally divide and distribute the estate, both real and personal, of the husband and so much of the estate of the wife as shall have been derived from the husband, between the parties." It is argued that the property to which *Mrs. Schoen* holds title constitutes her separate estate, and that it is not property derived from her husband. Her title thereto is traced to the Racine manufacturing busi-

ness. The facts concerning that business are set forth in the statement of facts and need not be repeated here. The defendant conceived and initiated that business. His wife rendered him most material assistance in the conduct thereof. It is true that, when the time for settlement with Siegel Bros. arrived, the notes were signed by *Mrs. Schoen* and the name of the business was changed from Schoen Manufacturing Company to *Rosa Schoen,* doing business as the Schoen Manufacturing Company. The relations of the parties to the business, however, remained the same. The defendant continued to dominate and direct it, and when the business was suspended *Schoen,* the defendant, took the money without any question on the part of the plaintiff and invested it in business in Denver. He took possession of the machinery and disposed of it as he saw fit. He sent *Mrs. Schoen* $200 a month for living expenses while in Chicago. The testimony given by the defendant in bankruptcy proceedings to the effect that his wife owned this property is not controlling in this action. It may be that as between defendant and his creditors she did own the property so that his creditors could not reach the same. The most that can be said is that the earnings of the Racine business were the result of their joint effort.

In *Pfingsten v. Pfingsten,* 164 Wis. 308 (159 N. W. 921), at page 315 this court, in discussing this statutory provision for a division of property upon a decree for divorce, says that the provision "rests, largely, upon the fact that, in many cases, the property possessed by the parties is the result of their joint efforts; so that, equitably, a part of it should go to each, not excluding the wife, necessarily, because of her fault being adultery. The division may be made according to the equities of the case, as regards the origin of the possessions, and the relations between the parties be completely ended as in case of a separation without any jurisdiction to award alimony."

. The trial court took the view that everything was lost in Denver, and that is true. We, however, have gone back of Denver, and taken into consideration the manner in which this property was acquired at Racine, because of the claim on the part of appellant that respondent took her money to Denver and holds it as her trustee. Our conclusion is that the property owned by *Mrs. Schoen* was acquired from her husband and that it was properly taken into account in the final distribution made by the court. The trial court, in awarding *Mrs. Schoen* an amount equal to about one third of the total value of the property owned by plaintiff and defendant, but followed the rule well established in this court that, under ordinary circumstances, upon a final division of the property the wife should be awarded one third thereof.

*By the Court.*—Judgment affirmed.

Doerfler, J., took no part.

A motion for a rehearing was denied, without costs, on September 23, 1921.